# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5655 | **DATE** | 8/26/2004 |
| **CASE TITLE** | Perkins vs. Ameritech Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the Memorandum Opinion and Order, defendant's motion for summary judgment [60-1] is GRANTED. Judgment is entered for the defendant. Terminate case. *Geraldine Soat Brown*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | AUG 2 7 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | AHR | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | 82 |
| | Copy to judge/magistrate judge. | | 8/26/2004 | |
| | | U.S. DISTRICT COURT CLERK | date mailed notice | |
| GR | courtroom deputy's initials | 2004 AUG 27 AM 8:34 | GR | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

AUG 2 7 2004

GLORIA PERKINS,  )
Plaintiff,  )
)  **No. 00 C 5655**
v.  )  **Magistrate Judge Geraldine Soat Brown**
)
AMERITECH CORPORATION,  )
Defendant.  )

## MEMORANDUM OPINION AND ORDER

Defendant Ameritech Corporation ("Ameritech") has moved for summary judgment on all remaining claims brought by Plaintiff Gloria Perkins ("Perkins").[1] [Dkt 60.] For the reasons set forth below, Ameritech's motion is granted.

## JURISDICTION

Federal jurisdiction exists for this action under 28 U.S.C. § 1331. Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A complaint that specifically invokes federal law "'arises under' federal law for purposes of § 1331." *International Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 822 (7th Cir. 1999) (quoting 28 U.S.C. § 1331). Federal question jurisdiction is proper in this case because Plaintiff's remaining claims invoke the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et*

---

[1] As discussed below, Perkins agreed to dismiss many of the claims in her amended *pro se* complaint.

1



*seq.* The parties have consented to the jurisdiction of a Magistrate Judge. [Dkt 19.]

## FACTUAL BACKGROUND

Ameritech is a Delaware corporation that transacts business in Illinois. (Pl.'s Resp. Def.'s LR Stmt. ¶ 3.)[2] Perkins began working for Illinois Bell Telephone Company, a subsidiary of Ameritech, in 1974. (*Id.* ¶¶ 1, 6.) At all relevant times, Perkins was a member of a Local Union of International Brotherhood of Electrical Workers (the "Union"), which had negotiated a Collective Bargaining Agreement (the "CBA") with Ameritech. (*Id.* ¶ 6; Def.'s Comp. Ex. 5, Decl. Minerva Linares ¶ 4.) While employed by Ameritech, Perkins eventually took the position of Customer Account Specialist ("CAS") at the Ameritech Final Account Credit Verification Center (the "AFACVC") in Oak Park, Illinois. (*Id.*) At all relevant times, the AFACVC was a telephone call center responsible for verifying credit for new customers and collecting unpaid bills of former customers, including referring accounts to collection agencies. (*Id.* ¶ 7.)

---

[2] Ameritech's Motion for Summary Judgment and Memorandum of Law in Support of its Motion for Summary Judgment are cited herein as "Def.'s Mot." and "Def.'s Mem.," respectively. [Dkt 60.] Ameritech's Local Rule 56.1(a)(3) Statement of Uncontested Material Facts is cited as "Def.'s LR Stmt." [Dkt 61] Ameritech also submitted a two volume Compendium of Evidence in support of its motion, which is cited as "Def.'s Comp." [Dkt 63.] Perkins' Response to Ameritech's Motion for Summary Judgment is cited as "Pl.'s Resp." [Dkt 68.] Perkins submitted one document [dkt 69] containing both Plaintiff's Local Rule 56.1(b)(3)(A) Response to Defendant's Statement of Material Facts (cited as "Pl.'s Resp. Def.'s LR Stmt.") and Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Undisputed Facts (cited as "Pl.'s Stmt. Add'l Facts"). Perkins also filed a Compendium of Evidence in support of her position, which is cited as "Pl.'s Comp." [Dkt 70.] Ameritech's Reply Memorandum of Law in Support of its Motion for Summary Judgment is cited as "Def.'s Reply" [dkt 76], and Ameritech's Reply to Plaintiff's Statement of Additional Facts is cited as "Def.'s Reply Pl.'s Stmt. Add'l Facts" [dkt 77].

### 1. The CAS Position

During the relevant time period, CASs were responsible for working "on-line" and "off-line." (*Id.* ¶ 10.) On-line work primarily involved receiving inbound calls – telephone calls from residential customers regarding issues such as getting approved for service or paying the final bills on their accounts. (*Id.*) The parties are in dispute, however, as to the primary job functions of working off-line. According to Ameritech, off-line work primarily involved making outbound calls – telephone calls to residential customers to discuss issues such as proof of residency and adjustments on accounts. (Def.'s LR Stmt. ¶ 10.) Perkins claims, however, that off-line work primarily involved data entry, such as verifying customer accounts. (Pl.'s Resp. Def.'s LR Stmt. ¶ 10.) Ameritech asserts that CASs assigned to perform primarily off-line work at the AFACVC were required to handle overflow calls (inbound calls when call volumes rose above what the on-line CASs could handle), which occurred daily in 1999. (Def.'s LR Stmt. ¶ 13.) Perkins contends that certain off-line positions did not handle overflow calls. (Pl.'s Resp. Def.'s LR Stmt. ¶¶ 8, 13.)

In 1999, CASs would rotate between teams or into different positions every three to six months. (*Id.* ¶ 14.) According to Ameritech, the rotation system was implemented to allow CASs who met their performance objectives to switch to on-line or off-line positions in accordance with the needs of the business. (Def.'s LR Stmt. ¶ 14.) Perkins contends that CASs were not rotated in accordance with the needs of the business but rather based on "managerial favoritism" and on a volunteer basis. (Pl.'s Resp. Def.'s LR Stmt. ¶ 14.)

### 2. Ameritech's Relevant Employment Policies

*Equal Employment Opportunity and Affirmative Action Policies*

At all relevant times, Ameritech had in effect certain Equal Employment Opportunity and Affirmative Action policies, which were contained in a booklet distributed to employees annually (the "EEO/AA Booklet"). (*Id.* ¶ 17; Def.'s Comp. Ex. 2, Gipson Decl., Ex. B.) The EEO/AA Booklet contained, among other things, a page on the ADA which informed employees that they could call an EEO help-line for additional information, and a form for employees to voluntarily self-identify themselves as disabled and request accommodations. (Pl.'s Resp. Def.'s LR Stmt. ¶ 17.) Perkins received a copy of the 1999-2000 EEO/AA Booklet on September 17, 1999. (*Id.* ¶ 18.)

*Attendance Policy*

Ameritech also had a written attendance policy applicable to CASs (the "Attendance Guidelines"), which Perkins claims was applied arbitrarily. (*Id.* ¶ 20; Def.'s Comp. Exs. 8-10, Perkins Dep., Ex. 11, Attendance Guidelines). The Attendance Guidelines provided for incident-based progressive discipline. (Pl.'s Resp. Def.'s LR Stmt. ¶ 22.) Specifically, after violations beyond a certain threshold number of violations, the disciplinary steps were: (i) first written warning; (ii) final written warning; (iii) three-day suspension; and (iv) suspension pending dismissal. (Attendance Guidelines at 2.) The threshold number of attendance violations was met by any of the following: six tardies, 48 hours or six cases of incidental absences, two disability leaves in two years, or three disability leaves in five years. (*Id.* at 1.)

In order to track attendance, CASs were required to sign sheets upon arrival and log into the computer system. (Pl.'s Resp. Def.'s LR Stmt. ¶ 25; Perkins Dep. at 247-48.) Managers were responsible for overseeing the signing-in and attendance of their employees. (Pl.'s Resp. Def.'s LR Stmt. ¶ 25.) As of April 1, 1999, the Attendance Guidelines provided a grace period on tardiness

4

that allowed an employee to be up to three minutes late without being charged with a tardy. (*Id.* ¶ 23; Attendance Guidelines at 1.)

*Accommodation Policies*

According to Ameritech, at all relevant times its Occupational Medicine Department (the "OMD") assessed employees' work restrictions and requests for accommodations, and employees who presented doctors' notes with work restrictions or requested accommodations were referred to the OMD to determine whether the restriction or accommodation was medically substantiated. (Def.'s LR Stmt. ¶ 26.) Ameritech also had a Disability Service Center (the "DSC") that administered its disability plans. (Pl.'s Resp. Def.'s LR Stmt. ¶ 27.) The DSC was managed by Sedgwick Claims Management Services, Inc. (*Id.*)

### 3. Perkins' Medical Leaves and Accommodation Requests

Perkins was diagnosed with depression/anxiety in 1994. (*Id.* ¶ 72; Perkins Dep. at 24.) Perkins testified that, at the time of the diagnosis, she was having some difficulties performing her job duties. (Perkins Dep. at 307.) According to Perkins, she suffered anxiety attacks; went through bouts of not being able to sleep, which affected her work generally; and on days that her depression was severe, was unable to perform at her maximum level. (*Id.* at 307-08.). Perkins also testified that, since she was diagnosed with depression, she has not engaged in sexual relations, been involved in an intimate relationship or had any feelings of intimacy or sexuality. (Pl.'s Comp. Ex. 16, Perkins Decl. ¶¶ 11, 12.)

Based on Ameritech's Attendance Records, it appears that Perkins took a disability leave for

5

more than two months in 1995. (Perkins Dep., Ex. 4, 1995 Attendance Record). Perkins also took a disability leave from the end of January to approximately mid-March in 1996. (Pl.'s Stmt. Add'l Facts ¶ 12; Perkins Dep. at 430; Perkins Dep., Ex. 4, 1996 Attendance Record.) Perkins testified that when she returned to work in June 1996, she had difficulty performing her duties as a CAS, depending on the severity of her illness, and her condition became worse when she came in contact with an irate customer. (Def.'s Resp. Pl.'s Stmt. Add'l Facts at ¶¶ 3, 13; Perkins Dep. at 319, 448.) However, in 1996, Perkins did not inform anyone at Ameritech of her alleged problems. (Perkins Dep. at 319.)

Perkins testified that, in the months preceding October 1996, there would be periods of up to two weeks when she was getting less than five hours of sleep a night. (Pl.'s Stmt. Add'l Facts ¶ 15; Perkins Dep. at 450-53.) Perkins claims that, due to her depression, there were days when she was not interested in cooking, did not drive, and did not or was not physically able to shower, take a bath, put on make-up or fix her hair. (Perkins Dep. 374-377.) According to Perkins, she was "desperately" asking Ameritech for accommodations because she could not concentrate on customers at that time. (*Id.* at 453.) (That statement is at odds with her earlier testimony that she did not tell anyone at Ameritech of her problems.) Perkins took another disability leave from October 6, 1996 until January 24, 1997. (Def.'s Resp. Pl.'s Stmt. Add'l Facts ¶ 3.)

Perkins testified that, in approximately early to mid-1998, she informed her supervisor at the time, David Hernandez, about her depression and anxiety disorder and asked him, on many occasions, to put her off-line with only "periodical[]" customer contact.[3] (Pl.'s Stmt. Add'l Facts

---

[3] However, at another point in her deposition, Perkins testified that she asked Mr. Hernandez to be relieved from *all* contact with customers." (Perkins Dep. at 29) (emphasis added.)

¶ 4; Perkins' Dep. at 26-28, 321, 467-476.) According to Perkins, Mr. Hernandez told her that he would have to speak with the manager at the time, Kim Williams, and he subsequently informed Perkins that there were no off-line functions available for her and that her job description included customer contact. (Perkins' Dep. at 27-28, 322, 476.) Perkins apparently did not provide Mr. Hernandez with any medical documentation to support those accommodation requests. (*Id.* at 38-39.)

Sometime in 1998, Perkins was diagnosed with fibromyalgia. (Pl.'s Resp. Def.'s LR Stmt. ¶ 72.) Perkins submitted requests for accommodation and supporting medical documentation to the OMD and was granted an illness paid leave and then a disability leave from July 23, 1998 to September 3, 1998. (*Id.* ¶¶ 78, 79; Perkins Dep., Ex. 4, 1998 Attendance Record.) When Perkins returned to work in September 1998, she was allowed to work half-days and off-line on a temporary basis until October 2, 1998. (Pl.'s Resp. Def.'s LR Stmt. ¶ 79; 1998 Attendance Record.) After returning to full-time work on October 2, 1998, Perkins worked off-line on a temporary basis and was granted FMLA time until January 2, 1999 for intermittent doctor visits. (Pl.'s Resp. Def.'s LR Stmt. ¶ 79.) Perkins submitted medical documentation substantiating her need to work off-line and be out of work on those occasions. (*Id.*) Perkins testified that, in January or February 1999, she again requested an accommodation from Mr. Hernandez, but Mr. Hernandez told Perkins that she must work on-line. (Perkins Dep. at 488-89.)

According to Perkins, she also requested off-line accommodations from the Attendance Manager, Terrine Sumerlin, at the end of 1998 or early 1999. (*Id.* at 338, 509-12.) Perkins claims that Ms. Sumerlin told her that she needed to present a doctor's letter showing proof of a disability. (*Id.* at 509-12.) Perkins apparently then wrote a note to Ms. Sumerlin, attaching a doctor's letter

dated January 26, 1999. (*Id.* at 510-11; Perkins Dep., Ex. 6, Note from Perkins to Ms. Sumerlin attaching doctor's note.) According to Ameritech, Ms. Sumerlin faxed that letter to the OMD.[4] (Def.'s Resp. Pl.'s Stmt. Add'l Facts ¶ 26.) Perkins claims that she followed up with Ms. Sumerlin a week or so later and was told that her accommodation request had been denied. (Perkins Dep. at 511.) However, between January 26, 1999 and February 22, 1999, Ameritech gave Perkins intermittent leave and Perkins took approximately nine paid days off for vacation and illness. (Pl.'s Resp. Def.'s LR Stmt. ¶ 80; Def.'s Reply Pl.'s Stmt. Add'l Facts ¶ 27; Perkins Dep. at 57-58.) According to Ameritech, those requests were supported by medical records. (Def.'s LR Stmt. ¶ 80; Pl.'s Resp. Def.'s LR Stmt ¶ 80.)

Ameritech records reflect that Perkins began her last medical leave on February 22, 1999 for a depressive disorder. (Pl.'s Resp. Def.'s LR Stmt. ¶ 30; Def.'s Resp. Pl.'s Stmt. Add'l Facts ¶ 27; Perkins Dep., Ex. 4, 1999 Attendance Record.)[5] She was approved for short-term disability benefits through May 17, 1999. (Pl.'s Resp. Def.'s LR Stmt. ¶ 30.) Apparently, Perkins applied for further disability benefits, but that request was denied, because on June 4, 1999, Eleanor Hale, a supervisor who was also acting as Attendance Manager, wrote a letter to Perkins stating that her claim for further disability benefits was denied and Perkins had to provide sufficient documentation of her

---

[4] Although Ms. Sumerlin has no recollection of faxing that doctor's letter to the OMD (Def.'s Comp. Ex. 11, Sumerlin Dep. at 191), she identified her handwriting on a fax cover sheet, which indicates that, on January 28, 1999, she faxed two pages to Marsha Caulkins, a nurse in the OMD. (*Id.*; Perkins Dep., Ex. 6, Fax to Marsha Caulkins; Def.'s Comp. Ex. 3, Decl. Marsha Caulkins ¶ 2.) Presumably, one of those pages was the fax cover sheet and the other page was the doctor's letter.

[5] However, in her deposition, Perkins testified that the attendance records indicated that she was out for illness on March 1, 1999, and began her disability leave on March 2, 1999. (Perkins Dep. at 60.)

inability to work, or return to work by June 11, 1999. (Def.'s Comp. Ex. 12, Dep. of Eleanor Hale, Ex. 6, 6/4/99 Letter from Hale to Perkins.) Ms. Hale also advised Perkins that, if she did not provide such documentation or return to work, it would be viewed that she abandoned her job. (*Id.*)

Although the record is not completely clear on this point, Perkins presumably provided some additional documentation because Ameritech considered and rejected her application for disability. By letter dated June 22, 1999, the DSC informed Perkins that she was denied disability benefits as of May 18, 1999, based on its finding that "there [wa]s no objective medical documentation to support [Perkins'] inability to perform [her] occupation as a [CAS] with or without reasonable accommodation." (Perkins Dep., Ex. 7, 6/22/99 Letter from Gloria Berger to Perkins at 1.) In that letter, Perkins was also told that she had the right to appeal the denial of benefits. (*Id.* at 2.)

Perkins appealed the denial of benefits and that denial was upheld. (Def.'s LR Stmt. ¶ 33; Perkins Dep., Ex. 8, 9/22/99 Letter from Linda Nikitas to Perkins.) According to Ms. Nikitas, Perkins' medical records revealed that her condition had improved, there was no change in her medications, there was no indication that she was in treatment with any health care provider after May 21, 1999 and there were no clinical findings that she was severely functionally impaired. (*Id.*)[6]

Perkins requested a leave of absence while she appealed the denial of disability benefits, which Ameritech granted. (Pl.'s Resp. Def.'s LR Stmt. ¶ 34.) As a result, Perkins was on another leave of absence from June 16, 1999 to July 9, 1999. (*Id.*) When Perkins' leave of absence expired, she used her vacation time to remain off work until July 23, 1999. (*Id.* ¶ 35.)

---

[6] Perkins disputes that finding, claiming that her medical records proved that she had not improved and still suffered from depression. (Pl.'s Resp. Def.'s LR Stmt. ¶ 33.) However, Perkins does not point to any specific medical records to support that assertion. Perkins only cites Dr. Love's deposition testimony taken on June 26, 2002, which obviously was not presented to Ameritech in mid-1999 in support of her accommodation request. (*Id.*)

Perkins did not return to work until August 2, 1999. (*Id.* ¶ 36; Perkins Dep. at 60, 76.)  After she returned, Perkins worked off-line for two weeks to catch up on her mail, review office procedures, get trained on new billing and communications systems, and get re-trained to work on-line. (Pl.'s Resp. Def.'s LR Stmt. ¶¶ 40, 42; Perkins Dep. at 228.)  After working off-line for two weeks, Perkins was assigned to work on-line. (Pl.'s Resp. Def.'s LR Stmt. ¶ 43; Perkins Dep. at 228, 498.)

Perkins claims that, shortly after she returned to work in August 1999, she explained her medical illness to Ms. Hale and asked to go off-line. (Perkins Dep. at 228, 497-500.)  According to Ameritech, however, Perkins only asked Ms. Hale whether she could work off-line because of an "unspecified disability." (Def.'s Comp. Ex. 6, Decl. Eleanor Hale ¶ 5.)

The parties are in dispute as to whether Perkins requested to work off-line indefinitely or only for a limited period.  There is also a dispute as to whether Perkins requested no customer contact or only limited customer contact.  Ameritech claims that Perkins asked to work off-line with no customer contact for an indefinite period of time. (Def.'s LR Stmt. ¶ 88; Def.'s Resp. Pl.'s Stmt. Add'l Facts ¶ 30).  However, Ms. Hale testified that, although she vaguely remembered discussions that customer contact was difficult for Perkins, she could not remember the exact words of Perkins' request. (Hale Dep. at 125-26.)  Perkins claims that she asked to work off-line only when she was having problems coping with her illness and that she requested only limited on-line customer contact. (Pl.'s Resp. Def.'s LR Stmt. ¶ 88; Pl.'s Stmt. Add'l Facts ¶ 30; Perkins Dep., Ex. 2, Perkins' Resp. Ameritech's First Set Interrogs. at Interrog. No. 5.)  However, in her deposition, Perkins stated that she "basically asked for off-line functions" without any limitations and she requested "not to

have to speak with customers." (Perkins Dep. at 94, 102, 530.)[7]

When Perkins asked Ms. Hale to work off-line, Ms. Hale told her that she would need to meet objectives before she could have any type of off-line functions. (Def.'s Reply Pl.'s Stmt. Add'l Facts ¶ 24; Perkins Dep. at 228-29, 499.) According to Ms. Hale, she also told Perkins that she should contact the OMD about an accommodation. (Hale Decl. ¶ 6.) However, Perkins denies that statement, claiming that Ms. Hale never told her to contact the OMD. (Pl.'s Resp. Def.'s LR Stmt. ¶ 84; Perkins Dep. at 95, 229.)

After returning to work in August 1999, Perkins never submitted a request for an accommodation to the OMD. (Def.'s LR Stmt. ¶ 84; Perkins Dep. at 229; Caulkins Decl. ¶¶ 9, 10.) Nor did Perkins provide any medical documentation or medical restrictions to support her claim for an accommodation. (Perkins Dep. at 93, 231; Caulkins Decl. ¶ 9.)

### 4.    Perkins' Attendance Problems

Perkins received a first warning for attendance violations in 1998. (Pl.'s Resp. Def.'s LR Stmt. ¶ 48; Perkins Dep. at 117.) Perkins was issued a "final written warning" on August 5, 1999.[8] (Pl.'s Resp. Def.'s LR Stmt. ¶ 49; Perkins Dep. at 118.) According to Ameritech, Perkins was given

---

[7] Perkins' counsel submitted a Sur-Reply in Support of Oral Argument, pointing to Perkins' deposition testimony at pages 526-530 in an effort to clarify the discrepancies in Perkins' testimony on this issue. (Pl.'s Sur-Reply at ¶¶ 4-9.) [Dkt 80.] However, in that testimony, Perkins stated that she "basically asked for off-line functions. . . . I did not ask for limitations." (Perkins Dep. at 530.)

[8] Perkins claims that the issuance of the final written warning was an improper step in the disciplinary process because she was never issued a first written warning. (Pl.'s Resp. Def.'s LR Stmt. ¶ 49.) However, during her deposition, Perkins admitted that she was given a first written warning in 1998. (Perkins Dep. at 117.)

a final warning because she remained off of work after May 17, 1999 without the DSC's approval, and that time off was considered a chargeable absence under the Attendance Guidelines. (Def.'s LR Stmt. ¶ 49.) Ms. Sumerlin wrote a letter to Perkins regarding the final warning and stated that additional chargeable incidents could lead to more serious corrective action, including the termination of her employment. (Id.)[9]

According to Ameritech, on October 26, 1999, Perkins was late to work because of car trouble and, in accordance with the Attendance Guidelines, was suspended for three days. (Id. ¶ 51.) Perkins, however, claims that she phoned in 1½ hours ahead of time, advised Ms. Sumerlin that she had car trouble and got approval to come in late. (Perkins Dep. at 120-122; Pl.'s Resp. Def.'s LR Stmt. ¶ 51.)

On October 26, 1999, Ms. Hale, acting as the Attendance Manager in Ms. Sumerlin's absence, wrote Perkins a letter regarding the three-day suspension, which was scheduled to be served on November 9, 10 and 16, 1999. (Pl.'s Resp. Def.'s LR Stmt. ¶ 51; Perkins Dep., Ex. 12, 10/26/99 Letter from Ms. Hale to Perkins.) In that letter, Ms. Hale warned Perkins that further chargeable incidents could lead to more serious corrective action, including the termination of her employment. (10/26/00 Letter from Ms. Hale to Perkins.) Although Perkins claims that she discussed the three-day suspension with the Union steward, the Union never filed a grievance on her behalf. (Perkins Dep. at 123-124.)

On October 28, 1999, Perkins asked Mike Muhs, the Force Manager at the Oaks Park facility, if she could switch her lunch hour to attend a doctor's appointment. (Def.'s LR Stmt. ¶ 53.)

---

[9] Under the Attendance Guidelines, an additional attendance incident after an employee receives a final written warning will result in a three-day suspension. (Pl.'s Resp. Def.'s LR Stmt. ¶ 50; Attendance Guidelines at 2.)

According to Ameritech, Mr. Muhs permitted Perkins to switch her lunch hour, but did not extend her time for lunch, and Perkins returned late from her requested lunch hour. (*Id.*) Perkins claims that Mr. Muhs gave her approval to attend a doctor's appointment and that she was not one hour and twelve minutes late, as indicated on her attendance record. (Pl.'s Resp. Def.'s LR Stmt. ¶ 53; Perkins Dep. at 125-27).

Ameritech claims that Perkins was tardy to work again on November 3, 1999. (Def.'s LR Stmt. ¶ 54.) Perkins contends that she was not tardy but, rather, had a problem logging on to her computer. (Pl.'s Resp. Def.'s LR Stmt. ¶ 54.) According to Perkins, a computer technician informed her that he would inform management that she was not tardy. (*Id.*) Perkins claims that she was never questioned about the alleged tardy, and none of the managers informed her that she was being marked tardy that day. (*Id.*; Pl.'s Stmt. Add'l Facts ¶ 54.) Ameritech denies those assertions. (Def.'s Resp. Pl.'s Stmt. Add'l Facts ¶ 54.)

On November 4, 1999, Perkins was suspended for three days due to the occurrences on October 26, October 28 and November 3. (Pl.'s Resp. Def.'s LR Stmt. ¶ 55.) Perkins claims that the three-day suspension was improper because the tardy incidents were not properly administered. (*Id.*) According to Ameritech, because Perkins had already been scheduled for suspension for the October 26, 1999 incident, she could have been suspended pending dismissal for the October 28 and November 3 incidents in accordance with the Attendance Guidelines. (Def.'s LR Stmt. ¶ 55.) Instead, Perkins received a lesser sanction, another three day suspension (November 4, 5 and 8). (Pl.'s Resp. Def.'s LR Stmt. ¶¶ 55, 56.) Ms. Hale, acting as the Attendance Manager, wrote a letter to Perkins regarding that suspension and again warned Perkins that further chargeable incidents could lead to more serious corrective action, including the termination of her employment. (*Id.* ¶ 55;

Perkins Dep., Ex. 13, 11/4/99 Letter from Ms. Hale to Perkins.)

Perkins was tardy again on December 10, 1999. (Pl.'s Resp. Def.'s LR Stmt. ¶ 57; Perkins Dep. at 131.) On December 13, 1999, as a result of her late arrival on December 10, Perkins was suspended pending dismissal. (Pl.'s Resp. Def.'s LR Stmt. ¶ 58.) Ms. Sumerlin wrote Perkins a letter regarding the suspension pending dismissal, noting that Perkins had already been given a final written warning and a three-day suspension, and had been informed of her need to improve her attendance. (Id.; Perkins Dep., Ex. 14, 12/13/99 Letter from Ms. Sumerlin to Perkins.)

Perkins admits that she was suspended in accordance with the CBA. (Pl.'s Resp. Def.'s LR Stmt. ¶ 60.) The CBA provided that, after Ameritech gave the Union notification of a contemplated dismissal for just cause of an employee with six or more months of service, the Union could request that a Union-Management Review Board meeting be convened relative to the dismissal. (Id.)

### 5. Perkins' Back to Work Agreement

Perkins' Union requested a Review Board meeting, which was held on December 20, 1999. (Id. ¶ 61.) Perkins attended the Review Board meeting along with a business representative and steward from the Union. (Id. ¶ 62; Perkins Dep. at 131-133.) Although Perkins could have been dismissed, she was offered the opportunity to sign an agreement (the "Back to Work Agreement"), which allowed her to remain employed. (Pl.'s Resp. Def.'s LR Stmt. ¶ 63; Perkins Dep., Ex. 15, Back to Work Agreement; Decl. Minerva Linares ¶ 9.) The Back to Work Agreement provided, in relevant part, that (1) if Perkins incurred any additional chargeable attendance incidents over the coming year, Ameritech would have just cause to terminate her employment; and (2) Ameritech would consider mitigating circumstances in making any decision about Perkins. (Back to Work

Agreement ¶ 3.) Although Perkins was not required to accept the agreement and could have grieved and arbitrated her dismissal, Perkins and the Union steward signed the Back to Work Agreement on January 3, 2000. (Pl.'s Resp. Def.'s LR Stmt. ¶ 65; Perkins Dep. at 133; Linares Decl. ¶ 12.)

### 6. Perkins' Resignation

Perkins returned to work on January 3, 2000 but took a couple of vacation days after that. (Perkins Dep. at 135). On January 10, 2000, only a week after signing the Back to Work Agreement, Perkins resigned by e-mail message, stating: "I am leaving the company effective 1-11-2000. I am requesting any add-itional [sic] vacation time pay that I may have." (Pl.'s Resp. Def.'s LR Stmt. ¶ 66; Perkins Dep., Ex. 16, Perkins' Resignation.) During her deposition, Perkins testified that she "felt forced" to send that message because of the "stipulations" in the Back to Work Agreement. (Perkins Dep. at 135-36.) She also testified that she resigned because she was "unable to function at the time" and "unable to work." (*Id.* at 244, 267.)

## PROCEDURAL BACKGROUND

On January 5, 2000, two days after she signed the Back to Work Agreement but prior to her resignation, Perkins filed a charge with the EEOC, alleging age and disability discrimination. (Perkins Dep., Ex. 17, 1/5/00 EEOC Charge; Perkins Dep. at 137.) Specifically, in that charge Perkins alleged that from May 17, 1999 to January 5, 2000 she was removed from leave, placed on final warning for attendance, denied two requests for reasonable accommodation, suspended and terminated for attendance, required to sign an agreement that she would not take time off for her disability in order to return to work, and passed over for several promotions. (1/5/00 EEOC Charge.)

However, Perkins did not check the box for retaliation on that charge. (*Id.*)

On February 20, 2000, Perkins filed a second charge with the EEOC, alleging disability discrimination beginning and ending on January 19, 2000 – nine days after she resigned from Ameritech. (Perkins Dep., Ex. 1, 2/20/00 EEOC Charge.) Specifically, in that charge, Perkins alleged that she was forced to return from medical leave in May 1999, was disciplined for attendance, was denied reasonable accommodations, was subjected to disciplinary actions including termination, had to return to work under a threatening agreement, and felt forced to quit on January 10, 2000. (*Id.*) Perkins did not check the box for retaliation on that charge, either. (*Id.*)

On June 16, 2000, the EEOC issued two right-to-sue letters, one for each charge. (Pl.'s Resp. Def.'s LR Stmt. ¶ 71; Perkins Dep., Exs. 1, 18.) Perkins then filed this action in the district court claiming that Ameritech discriminated against her on the basis of her age and disability beginning on or about December 13, 1999.[10] (Am. Compl. at 2-3.) [Dkt 8.] Specifically, in her *pro se* amended complaint, Perkins alleged that Ameritech failed to promote her, failed to reasonably accommodate her disability, retaliated against her, and terminated her employment. (*Id.* at 4.) In support of her claims, Perkins alleged:

> In 1994, I was diagnosed with major depression. I grieved to have my job transferred to Michigan. In retaliation, I lost my position and was transferred back to Illinois. Each time when I requested accommodations, there would be retaliations. My doctors [sic] letters would be ignored. For two years or more I would request "off line" functions. But these positions were held by new employees. The new team that I was assigned to was basically an off line function team. I had more seniority than anyone on my team, but I was put on line indefinitely.

---

[10] That date was not mentioned in either of Perkins' EEOC charges; however, she did state that she was passed over for a promotion in December 1999. (1/5/00 EEOC Charge.)

(*Id.*) In its answer, Ameritech denied the material allegations of the amended complaint and set forth twelve affirmative defenses. (Answer at 2-7.) [Dkt. 11.]

On August 29, 2003, Perkins filed an agreed amended motion to voluntarily dismiss with prejudice the counts of the amended complaint which were based on the Age Discrimination in Employment Act and failure to promote counts. (Mot. Dismiss ¶ 4.) [Dkt 57.] On September 3, 2003, the court entered an order granting Perkins' motion and stating: "[Perkins'] remaining claims are brought under the [ADA] for termination, failure to accommodate [Perkins'] disabilities and retaliation for requesting accommodation." (Sept. 3, 2003 Order.) [Dkt 58.]

Defendant now moves for summary judgment on Perkins' remaining claims, arguing that: any claims that occurred prior to March 12, 1999 are time-barred; Perkins is not a qualified individual with a disability covered by the ADA; Perkins' failure to accommodate claim should be dismissed because the accommodation sought was not reasonable and Perkins was responsible for the breakdown of the interactive process; Perkins was not terminated but voluntarily resigned, and she cannot establish that her resignation was an actual or constructive discharge; and Perkins' retaliation claim is barred by the scope of the charge doctrine and, even if it is not barred, she cannot establish a *prima facie* case of retaliation. (Def.'s Mem. at 2 n. 2, 5-17.) [Dkt 60.]

## LEGAL STANDARD

Summary judgment is proper when there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Indiana Funeral Directors Ins. Trust v. Trustmark Ins. Corp.*, 347 F.3d 652, 654 (7th Cir. 2003). "Judgment as a matter of law is appropriate when a party 'fails to make a showing sufficient to establish the

existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial.'" *Indiana Funeral Directors Ins. Trust*, 347 F.3d at 654 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "Indeed, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish its case, summary judgment is not only appropriate but required." *Id.*

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. In determining whether a genuine issue of fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id.* at 255. However, the court "is not required to draw unreasonable inferences from the evidence." *St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n.2 (7th Cir. 1997).

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex*, 477 U.S. at 323. Once the moving party has met the initial burden, the opposing party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Id.* at 324. The nonmoving party must designate specific facts showing that there is a genuine issue for trial. *Id.* It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which it relies. *Bombard v. Fort Wayne Newsp., Inc.*, 92 F.3d 560, 562 (7th Cir.

1996). With those standards in mind, the court turns to Ameritech's arguments.

## ANALYSIS

**1.      Perkins Is Time-Barred from Basing Any of Her ADA Claims on Alleged Discriminatory Acts That Occurred before March 12, 1999.**

Ameritech argues in a footnote that Perkins is time-barred from basing any of her ADA claims on events that occurred prior to March 12, 1999. (Def.'s Mem. at 2 n. 2.) (citing *Huels v. Exxon Coal USA, Inc.*, 121 F.3d 1047, 1049 (7th Cir. 1997) and *Conley v. Village of Bedford Park*, 215 F.3d 703, 710 (7th Cir. 2000)). As an initial matter, under the case law in this Circuit, a footnote "argument" need not be considered. *See, e.g., El Ranchito, Inc. v. City of Harvey*, 207 F. Supp. 2d 814, 822 (N.D. Ill. 2002) (court may treat argument raised in footnote as waived) (citing *Dresser Indus., Inc. v. Gradall Co.*, 965 F.2d 1442, 1448 (7th Cir.1992)); *AAR Intl., Inc. v. Vacances Heliades S.A.*, 202 F. Supp. 2d 788, 796 n. 2 (N.D. Ill. 2002) (same); *Standard Bank & Trust Co. v. Village of Orland Hills*, 891 F. Supp. 446, 449 n. 2 (N.D. Ill. 1995) (same). Although Ameritech also addresses its time-barred argument in its reply brief (*see* Def.'s Reply at 1-3), arguments not raised in opening briefs are waived. *See Wilson v. O'Leary*, 895 F.2d 378, 384 (7th Cir. 1990) (stating that the Seventh Circuit has consistently refused to consider arguments withheld until the reply brief). However, because Perkins addressed the time-barred argument in her response (Pl.'s Resp. at 4 n. 2), the court will exercise its discretion and consider the argument for purposes of deciding the present motion.

A plaintiff suing under the ADA is required to file a charge with the EEOC within 300 days of the alleged discriminatory conduct, and failure to do so results in an untimely complaint.

*Fairchild v. Forma Sci., Inc.*, 147 F.3d 567, 574 (7th Cir. 1998); *Huels v. Exxon Coal USA, Inc.*, 121 F.3d 1047, 1049 (7th Cir. 1997). Accordingly, since Perkins filed her initial EEOC charge on January 5, 2000, she cannot rely on any alleged discriminatory acts that occurred prior to March 12, 1999.

In her EEOC charges, Perkins claims that the alleged discrimination took place between May 17, 1999 and January 5, 2000 and on January 19, 2000 – all dates within the 300 day time period. (1/5/00 EEOC Charge; 2/20/00 EEOC Charge.) Furthermore, in the "particulars" of the EEOC charges, the earliest wrongdoing alleged by Perkins took place in May 1999, when Perkins was allegedly forced to return from medical leave. (2/20/00 EEOC Charge at 1.)

In her Amended Complaint, however, several of her allegations of discrimination extend outside the 300 day period. Although Perkins states that the discriminatory conduct began on or about December 13, 1999, she claims that she requested "off-line" functions for "two years or more" and that those requests were denied. (Am. Compl. ¶¶ 6, 12, 13.) Perkins also asserts that she "grieved to have [her] job transferred to Michigan" and "[i]n retaliation, [she] lost [her] position and was transferred back to Illinois." (*Id.* ¶ 13.) Perkins was transferred back to Illinois in 1996 (Perkins' Dep. at 26); thus, the job transfer grievances and the alleged retaliation took place sometime prior to 1997. Furthermore, in her Statement of Additional Facts, Perkins claims that she made various requests to work off-line from 1996 through early 1999 and that those requests were denied. (Pl.'s Stmt. Add'l Facts ¶¶ 4, 16-18, 23.) Because all of those alleged events occurred prior to March 12, 1999, Perkins cannot rely on those events (or any events that pre-date March 12, 1999) in establishing her ADA claims.

Perkins argues that the "continuing violation doctrine" applies to her failure to accommodate

claim. (Pl.'s Resp. at 4 n. 2) (citing *Arnold v. Janssen Pharm., Inc.*, 215 F. Supp. 2d 951, 959 (N.D. Ill. 2002)). "The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period." *Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 707 (7th Cir. 1995) (quoting *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992)). "For purposes of the limitations period, courts treat such a combination as one continuous act that ends within the limitations period." *Id.* (quoting *Selan*, 969 F.2d at 564). "'A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period.'" *Arnold*, 215 F. Supp. 2d at 959 (quoting *Dasgupta v. University of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997)). Three types of continuing violations are recognized by the Seventh Circuit:

> where the exact day of the violation is difficult to pinpoint because the employer's decisionmaking process takes place over a period of time; where the employer has a systematic, openly espoused policy alleged to be discriminatory; and where the employer's discriminatory conduct is so covert that its discriminatory character is not immediately apparent.

*Place v. Abbott Laboratories*, 215 F.3d 803, 808 (7th Cir. 2000). Only the last of those alternatives would arguably apply to Perkins' assertions.

The court in *Arnold v. Janssen Pharm.* relied on the last alternative – although not explicitly – in finding that the continuing violation doctrine could apply to a failure to accommodate claim. The court stated that "[p]erhaps it took some time for [the plaintiff] to realize that her employer was being unreasonable in failing to accommodate her disability. . . . It might well have been reasonable for [the plaintiff] to have given her employer a few months to make good on such promises." 215

F. Supp. 2d at 960.

In this case, however, Perkins does not claim that it took a period of time for her to realize that Ameritech was being unreasonable in allegedly failing to accommodate her disability. Furthermore, there is a significant period of time separating Perkins' various allegations of a failure to accommodate (ranging from 1996 through 1999), and there is no evidence linking the time-barred acts with the acts that are within the limitations period. Given the nature of Perkins' allegations, these are separate and discrete claims of a failure to accommodate that can only be raised if they accrued within 300 days of the date that Perkins filed her EEOC charge. *See Alek v. University of Chicago Hosp.*, No. 99 C 7421, 2002 WL 1332000 at *3 (N.D. Ill. June 17, 2002) (Hart, J.) (holding that an allegation of a failure to accommodate is a discrete claim that can only be raised if it accrued within 300 days of the date that plaintiff filed her administrative charge). Therefore, the continuing violation doctrine cannot be applied to Perkins' failure to accommodate claim, and Perkins is barred from basing that claim or any of her remaining claims on alleged conduct by Ameritech that occurred prior to March 12, 1999.[11]

---

[11] Perkins argues that, even if she is time-barred from basing her ADA claims on events that occurred prior to March 12, 1999, evidence concerning her medical condition, accommodation requests, work history and skills, in addition to Ameritech's alleged ADA violations, including its knowledge of Perkins' diagnosed depression and supporting medical documentation, failure to engage in the interactive process, and arbitrary attendance policies, is relevant as evidence that Ameritech knew about Perkins' medical history and requests for accommodations. (Pl.'s Resp. at 4 n. 2.) To the extent that such evidence is relevant to the timely allegations regarding Perkins' ADA claims, for example, as background or as part of Perkins' relevant medical history in 1999 or Ameritech's knowledge in 1999, such evidence will be considered. *See Alek*, 2002 WL 1332000 at *3.

**2. Plaintiff Is Not a Qualified Individual with a Disability under the ADA.**

In order to state a cause of action under the ADA, a plaintiff must show: (1) that she is disabled; (2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) that her employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation. *Stevens v. Illinois Dept. of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000). In this case, Ameritech contends that it is entitled to summary judgment because Perkins cannot show that she was disabled, as that term is defined by the ADA, or that she was otherwise qualified to perform the essential functions of the CAS position.

*Was Perkins "Disabled"?*

The ADA defines a "disability" as including "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A); *see* 29 C.F.R. §§ 1630.2(g)–(j); *see also Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002); *Contreras v. Suncast Corp.*, 237 F.3d 756, 762 (7th Cir. 2001). Whether a substantial limitation of a major life activity exists depends upon an analysis of the nature, severity, duration and long-term impact of the impairment. *Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959, 962 (7th Cir. 1996) (citing 29 C.F.R. § 1630.2(j)). Although the ADA does not define "major life activity," the plain meaning of the word "major" in the term "major life activity" denotes comparative importance and "suggest[s] that the touchstone for determining an activity's inclusion under the statutory rubric is its significance." *Bragdon v. Abbott*, 524 U.S. 624, 625 (1998). These "major life activities" include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. *Id.* at 638-39.

Here, Perkins was diagnosed with major depression and/or anxiety disorder in 1994 and fibromyalgia in 1998. (Pl.'s Resp. Def.'s LR Stmt. ¶ 72). Ameritech does not dispute that Perkins had an "impairment," as that term is defined by the ADA.[12] Rather, Ameritech argues that "[t]here is no objective evidence that depression/anxiety disorder or fibromyalgia substantially limited any of [Perkins'] major life activities." (Def.'s Mem. at 6.) (emphasis omitted). In response, Perkins claims that she is completely limited from sexual intimacy and substantially limited in her ability to sleep, interact with others, care for herself, and breathe. (Pl.'s Resp. at 7-12.)

The Seventh Circuit has not determined that engaging in sexual relations constitutes a major life activity for ADA purposes. *Contreras*, 237 F.3d at 764 n. 6. In any event, Perkins has not substantiated her claim of sexual difficulties with any documentation or evidence beyond her own deposition testimony that she stopped having sexual relations and has no desire to be sexually intimate. Such bald declarations, without anything more, cannot create a genuine issue of material fact as to whether Perkins is disabled which would preclude summary judgment. *See Stein v. Ashcroft*, 284 F.3d 721, 726 (7th Cir. 2002) (stating that bald, self-serving assertions in affidavits are insufficient to create issue of triable fact).

On the other hand, Perkins has presented some evidence that she is limited in her ability to sleep, interact with others, care for herself, and breathe, all of which are considered major life activities for purposes of the ADA. *See Silk v. City of Chicago*, No. 95 C 0143, 1997 WL 790598 at *7 (N.D. Ill. Dec. 17, 1997) (Coar, J.) (finding that "[s]leep is a basic function that humans do as part of their daily life" and, as such, is a "major life activity"); *Fitch v. Continental Casualty Co.*,

---

[12] Major depression can constitute a disability under the ADA. *Ogborn v. United Food & Commercial Workers Union, Local 881*, 305 F.3d 763, 767 (7th Cir. 2002) (citations omitted). However, isolated bouts of depression are not disabilities. *Id.* (citations omitted).

No. 01 C 1149, 2002 WL 31834877 at *8 (N.D. Ill. Dec. 16, 2002) (Kocoras, J.) ("Interacting with co-workers or peaceful interaction with others in any context is an activity that is 'central to most people's daily lives' and therefore constitutes a major life activity."); *Nawrot v. CPC Intl.*, 277 F.3d 896, 905 (7th Cir. 2002) (stating that caring for oneself is a major life activity for purposes of the ADA); 29 C.F.R. § 1630.2(i) (listing breathing and caring for oneself as major life activities).

However, it is unnecessary to determine whether that evidence rises to the level of a "disability" under the ADA or even creates a genuine factual dispute because Perkins has failed to demonstrate that she is a "qualified individual" who can perform the essential functions of the CAS position.

### Was Perkins a "Qualified Individual"?

The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The plaintiff bears the burden of proof on this issue; she must be able to show that she is a "qualified individual with a disability" in order to successfully prosecute an ADA claim. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). *See also Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002). Specifically, a plaintiff must pass a two-step test to be "a qualified individual with a disability." *Weiler*, 101 F.3d at 524 (citing 29 C.F.R. app. § 1630.2(m)). First, the individual must satisfy "the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Id.* (citing 29 C.F.R. app. § 1630.2(m)). Second, the individual must be able to "perform the essential functions of the position held or desired, with or

without reasonable accommodation." *Id.* (citing 29 C.F.R. app. § 1630.2(m)). Whether the plaintiff meets the "qualified individual with a disability" definition is determined as of the time of the employment decision (*id.*) (citing 29 C.F.R. app. § 1630.2(m)), and the plaintiff bears the burden of proof on this issue. *Id.* (citing *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 n. 3 (7th Cir. 1995)). *See also Miller v. Illinois Dept. of Corrections*, 107 F.3d 483, 484 (7th Cir. 1997) ("Under the ADA, the employer avoids all liability if the plaintiff would have been fired because [she was] incapable of performing the essential functions of the job, and the burden of proof on the issue of capability is not on the employer but on the plaintiff.").

The parties do not dispute that Perkins satisfies the prerequisites for the CAS position. Having employed Perkins as a CAS for so many years, Ameritech cannot dispute that. Rather, Ameritech argues that Perkins was not a "qualified individual" because she could not perform two essential functions of the CAS position; namely, regular attendance and speaking to customers. (Def.'s Mem. at 9-10.)

"Common sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his job." *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899-900 (7th Cir. 2000). "[I]n most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability." *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999). "Spotty attendance by itself may show lack of qualification . . . . Inability to work for a multi-month period removes a person from the class protected by the ADA." *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) (internal citation omitted). *See also Corder v. Lucent Tech. Inc.*, 162 F.3d 924, 926, 928 (7th Cir. 1998) (finding that attendance was an implied essential function of a job as

an account support representative); *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1000, 1003 (7th Cir. 1998) (noting that a teacher "who does not come to work cannot perform the essential functions of his job").

According to Ms. Gipson, a Senior Manager at the AFACVC, "[a]ttendance was and is considered by Ameritech to be a central and critical aspect of the [CAS] position." (Gipson Decl. ¶¶ 3, 20.) Perkins even conceded that she needed to be present at work to perform her CAS duties. (Perkins Dep. at 107). The question here, then, is whether Perkins has presented enough evidence that, at the time she was allegedly discriminated against, she was able to attend work reliably.

Perkins was absent on disability leave for some period of time every year between 1995 and 1999. (Perkins Dep., Ex. 4, Attendance Records.) Based on Perkins' Attendance Record, it appears that in 1999, Perkins was marked absent and/or tardy more often than not. (*Id.*, 1999 Attendance Record.) Perkins even admitted that, in the first half of 1999, she was out of the office "most of that time." (Perkins Dep. at 60.) There is nothing in the record to suggest that the future would be different from the past. In fact, Perkins testified in her deposition that she resigned from Ameritech because of the "stipulations" in the Back to Work Agreement. (*Id.* at 136.) Presumably, the "stipulations" to which Perkins was referring were those requiring her attendance. In her January 5, 2000 EEOC Charge, Perkins wrote that she "was required to sign an agreement that [she] would not take time off for [her] disability in order to return to work." (1/5/00 EEOC Charge at 1.) Perkins also testified that she resigned because she was "unable to function" and "unable to work." (Perkins Dep. at 244, 267.) Clearly, Perkins believed, at that time, that she could not work, with or without reasonable accommodation.

The facts in this case are similar to those found in *Corder*. In *Corder*, the plaintiff had gone

into a severe depression and missed an enormous amount of time from work. 162 F.3d at 926-27. In addition, the plaintiff continued to request an "unpredictable" amount of leave time as an ongoing accommodation. *Id.* Based on those facts, the Seventh Circuit found that the plaintiff failed to show that "she was able to attend work reliably" and, as a result, found that she "failed to show that she was 'qualified' for [the job]." *Id.* at 928.

A few months after issuing its decision in *Corder*, the Seventh Circuit concluded that, "in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability." *Waggoner*, 169 F.3d at 484. In *Waggoner*, the plaintiff was a production employee who suffered from "visual disturbances." *Id.* at 482. During the course of her employment, the plaintiff was granted two medical leaves, the first lasting 14 days and the second lasting 5½ months. *Id.* The plaintiff also missed work or was late to work 40 times during the 20 months she worked for the defendant. *Id.* In evaluating the plaintiff's ADA claim, the Seventh Circuit stated that "[t]here are limits to how far an employer must go in granting medical leave," and not every employer must "put up with employees who do not come to work." *Id.* at 483, 484.

Here, Ameritech granted Perkins five disability leaves between 1995 and 1999, totaling over thirteen months. During that time, Perkins was also allowed to work half-days for a period of time, and was given a number of vacation days, several intermittent or illness paid leaves and a leave of absence when she appealed the denial of benefits. Although there are factual disputes relating to Perkins' attendance violations, it is undisputed that Perkins was given a first warning in 1998 and a final warning in 1999, that she was tardy to work on *at least* two occasions (October 26, 1999 and December 10, 1999) in a three month period and that she was given several warnings of possible

28

termination. Significantly, Perkins also remained off work without Ameritech's approval after her last disability leave had expired and, unlike the plaintiffs in *Corder* and *Waggoner*, resigned from Ameritech because she believed that, at that time, she was "unable to work." In light of those facts, Perkins has failed to satisfy her burden of establishing that she is a "qualified individual" under the ADA. *See E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 950 (7th Cir. 2001) ("After reviewing the record and considering [the employee's] poor attendance record, we are convinced that [the employee] was unable to, and failed to, satisfy his burden of establishing that he is a 'qualified individual' under the ADA.").

Rather than attempt to show or even argue that she could attend work on a regular basis, Perkins simply attacks Ameritech's attendance policy, arguing that it was not "a strict attendance policy" and was "arbitrarily applied." (Pl.'s Resp. at 12-13.) However, whether the attendance policy was strictly enforced is irrelevant to the issue of whether Perkins' erratic attendance record made it impossible for her to perform the essential functions of the CAS position. Because Perkins has offered no probative evidence to support her claim that she could attend work reliably, this court finds that Perkins was not a "qualified individual with a disability" during the relevant time period. Based on that finding, it need not be decided whether customer contact was an essential function of the CAS position or whether Perkins could speak to customers.[13]

---

[13] Ameritech also argues that Perkins' failure to accommodate claim should be dismissed because the accommodation Perkins sought was unreasonable and because Perkins caused the breakdown in the interactive process. (Def.'s Mem. at 11-13.) However, it is unnecessary to decide those issues in light of Perkins' failure to show that a reasonable fact-finder could conclude that she was a "qualified individual with a disability." *See Basith v. Cook County*, 241 F.3d 919, 932 (7th Cir. 2001); *Bombard*, 92 F.3d at 563.

3.      **Perkins' Wrongful Termination Claim Fails Because She Voluntarily Resigned And Cannot Allege That She Was Constructively Discharged.**

In her Amended Complaint, Perkins alleges that Ameritech terminated her employment. (Am. Compl. ¶ 12(b).) However, the undisputed evidence establishes that Perkins resigned via e-mail on January 10, 2000 – a week after signing the Back to Work Agreement. (Pl.'s Resp. Def.'s LR Stmt. ¶ 66.) Perkins does not address that fact – or her termination claim at all – in her response to Ameritech's motion for summary judgment.[14]

In her EEOC Charges – although not in her Amended Complaint – Perkins implies that she was forced to resign. Perkins states that she "returned to work on a threatening, 'Return To Work' agreement" and that she "felt forced to quit [her] employment on January 10, 2000." (2/20/00 EEOC Charge.) Perhaps Perkins is attempting to claim that she was constructively discharged. Assuming, arguendo, that a claim based on constructive discharge is cognizable under the ADA (*E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 440 (7th Cir. 2000)), Perkins has waived any such claim by failing to allege it in her Amended Complaint. *See Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir. 1996). Perkins also waived any arguments in support of a constructive discharge claim by failing to make any such arguments in her response to Ameritech's motion for summary judgment. *See Laborers' Intl. Union of N. Am.*, 197 F.3d 1195, 1197 (7th Cir. 1999) (arguments that were not raised in response to plaintiff's motion for summary judgement are waived).

Even if Perkins had properly alleged a constructive discharge claim, however, she utterly fails to establish such a claim. To establish a claim of constructive discharge, Perkins must demonstrate

_____

[14] In the last section of her response brief (where Perkins addresses her retaliation claim), Perkins asserts that *Ameritech* terminated *her*. (Pl.'s Resp. at 21.) Perkins goes so far as to state that, "[a]fter 26 years of service, [she] was terminated, ostensibly, for being 10 minutes late." (*Id.*) However, it is undisputed that Perkins voluntarily resigned from Ameritech.

first that she was constructively discharged – that the employer made the working conditions so intolerable as to force a reasonable person to leave. *Sears, Roebuck & Co.*, 233 F.3d at 440 (citations omitted). Once that showing has been made, the plaintiff must establish that she was constructively discharged on account of her disability. *Id.* "[A] constructive discharge claim requires evidence that quitting was the only way the plaintiff could extricate herself from the intolerable conditions." *Gawley v. Indiana Univ.*, 276 F.3d 301, 315 (7th Cir. 2001). All circumstances are taken into account when determining whether a particular employment action constitutes constructive discharge. *Bond v. Sheahan*, 152 F. Supp. 2d 1055, 1071 (N.D. Ill. 2001) (citation omitted).

No reasonable jury could find that the circumstances surrounding Perkins' resignation amounted to a constructive discharge. Perkins has failed to present any evidence that her working conditions were intolerable or that she was forced to resign. On the contrary, the evidence indicates that Perkins felt "forced" to resign because in the Back to Work Agreement, which she negotiated with the assistance of her Union steward, she agreed that additional chargeable attendance incidents would constitute just cause for termination – hardly an "intolerable" condition. Ameritech is therefore entitled to summary judgment as a matter of law on Perkins' wrongful termination claim.

### 4. Perkins' Retaliation Claim Is Barred By The Scope Of The Charge Doctrine.

Ameritech next contends that Perkins' retaliation claim is beyond the scope of her EEOC Charges. (Def.'s Mem. at 15-16.) "A plaintiff may pursue a claim not explicitly included in an EEOC complaint only if her allegations fall within the scope of the charges contained in the EEOC complaint." *Cheek*, 97 F.3d at 202 (citing *Harper v. Godfrey Co.*, 45 F.3d 143, 147-48 (7th Cir. 1995)); *see also Green v. National Steel Corp.*, 197 F.3d 894, 898 (7th Cir. 1999); *Conley*, 215 F.3d

31

at 710. Two purposes are served by this rule: the EEOC is given an opportunity to settle the dispute between the employee and the employer, and the employer is given notice of the charges against it. *See Harper*, 45 F.3d at 148. Because most EEOC charges are completed by laypersons rather than by lawyers, a plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint. *Taylor v. Western & S. Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir. 1992). Rather, to determine whether the allegations in the complaint fall within the scope of the earlier EEOC charge, a court must consider whether the allegations are "like or reasonably related to" those contained in the charge, and whether the claims in the complaint reasonably could be expected to grow out of the allegations in the charge. *Cheek v. Western & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (quotations omitted). Claims are "like or reasonably related" if "there is a factual relationship between them." *Id.* at 501. In other words, "the EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*." *Id.*

Perkins did not explicitly allege retaliation in either of her EEOC charges; however, she argues that her "retaliatory discharge allegations are like and related to her failure to accommodate claims in that part of Ameritech's failure to accommodate [Perkins] was not modifying its attendance policy." (Pl.'s Resp. at 20.) However, in order to decide whether Perkins' retaliation allegations are "like and reasonably related to" her failure to accommodate claims (or any other claims in her EEOC charges), the court must understand the nature of the alleged retaliations. Based on Perkins' various filings and deposition testimony, that is a difficult task.

In her Amended Complaint, Perkins states that her "termination" was "retaliation [for] the many grievances [she] was trying to file." (Am. Comp. ¶ 12(f)). As set forth above, however, Perkins was not terminated; she voluntarily resigned from Ameritech. In the facts section of the

Amended Complaint, Perkins claimed that "[e]ach time when [she] requested accommodations[,] there would be retaliations." (*Id.* ¶ 13.) Yet, Perkins provided virtually no explanation as to the nature of those retaliations. In her Response to Ameritech's First Set of Interrogatories, Perkins described the "retaliations" as instances when her supervisors "harassed" her, "failed to put an end to retaliatory harassment by co-workers" and "failed to follow proper disciplinary procedures" with respect to Perkins' alleged attendance violations. (Perkins' Resp. Ameritech's First Set Interrogs. at Interrog. No. 6.) In her deposition, Perkins described the "retaliations" as "reprimand[s]" or "denying [her] . . . doctor's appointments, or any time off considered a[t] company discretion." (Perkins Dep. at 246.) At another point in her deposition, Perkins explained that the "retaliations" included occasions when she spoke to Ms. Hale about accommodations and Ms. Hale's "attitude towards [her] changed significantly . . . ." (*Id.* at 302.) Finally, in her Response to Ameritech's Motion for Summary Judgment, Perkins stated that she "received incremental steps in the disciplinary policy" and was "terminated" because she "filed grievances with her [U]nion regarding Ameritech's arbitrary attendance policies." (Pl.'s Resp. at 20.)

Reading all of those vague and conflicting allegations together, it appears that Perkins is attempting to argue that her supervisors retaliated against her by disciplining her for attendance problems when she filed union grievances regarding Ameritech's allegedly arbitrary attendance policies. *See id.* at 20-21 (Perkins states that when she was charged with an attendance violation, she filed a union grievance contesting that violation, and she was disciplined again for attendance problems.) If that is Perkins' argument, there is nothing in either of the EEOC charges that is "like or reasonable related to" that claim. In her EEOC charges, Perkins does not even allege that she complained about the alleged arbitrary attendance policies, much less that she suffered any adverse

action based on those complaints. Moreover, given the vagueness of the EEOC charges, Perkins'

subsequent filings and her testimony, it cannot be said that the charges and the complaint describe

the same conduct or implicate the same individuals. The EEOC charges did not give Ameritech fair

notice that Perkins was asserting a retaliation claim against it, and the EEOC would have no way of

guessing from the charges that it should attempt to resolve a retaliation claim. To allow Perkins to

bring a retaliation claim would frustrate the purpose of the requirement that a plaintiff file an EEOC

charge in the first place. Therefore, because Perkins did not raise the retaliation claim, "or even its

seeds," before the EEOC, Perkins is not entitled to bring that claim in this action. *Conley*, 215 F.3d

at 710 (quoting *Cheek*, 97 F.3d at 203); *see also Peters v. Renaissance Hotel Operating Co.*, 307

F.3d 535, 550 (7th Cir. 2002) (affirming summary judgment on retaliation claim where charge

contained allegations of only discrimination and plaintiff did not check the box indicating

retaliation). Thus, Ameritech is entitled to summary judgment on Perkins' retaliation claim.[15]

## CONCLUSION

For the foregoing reasons, Ameritech's Motion for Summary Judgment is GRANTED.

Judgment is entered for the defendant. This is a final order.

IT IS SO ORDERED.

*Geraldine Soat Brown*

/ GERALDINE SOAT BROWN
United States Magistrate Judge

August 26, 2004

---

[15] Because Perkins' retaliation claim is barred under the scope of the charge doctrine, there is no need to evaluate whether or not Perkins established a *prima facie* case of retaliation.